*James Harrison, A. Duvall, for appellant.*

*W. O. Dodd, for appellee.*

---

W. H. STOKES'S EX'R, ET AL., *v.* ELLEN S. SHIPPEN, ET AL.

**Change of Venue.**

Where a cause is reversed in this court on appeal the trial court has no authority to entertain or pass on an application for a change of venue prior to the cause being certified to the lower court.

**Wills—Fraud and Undue Influence—Evidence.**
> The jury in deliberating on the question of mental incapacity of a testator and fraud and undue influence, has the right to consider the provisions of the paper or will in connection with other evidence.

**Verdict of Jury.**
> This court is bound by the statute to give to the verdict of a jury the same effect as is given to verdicts in other than will cases and will not reverse the findings of the jury unless flagrantly or palpably wrong.

### APPEAL FROM SPENCER CIRCUIT COURT.

#### April 1, 1878.

Opinion by Judge Lindsay:

At the April term, 1876, of the Spencer Circuit Court a judgment was entered upon the verdict of a jury declaring that a certain paper then and there in contest was not the true last will and testament of Wm. H. Stokes, deceased. That judgment was reversed by this court on an appeal prosecuted by the propounders of the alleged will. Before the mandate of this court was filed in the clerk's office of the court below the propounders made application to the judge of that court at Chambers, for a change of venue. Their motion was denied. Afterward the issue of will or no will was again tried, and again there was a verdict and judgment against the propounders, and the case is now before this court on a second appeal.

The first error complained of is the refusal of the circuit judge to grant the change of venue. At the time the application was made the cause was not pending in this court for the purpose of any such proceeding.

Subdivision 2, Sec. 761, Civil Code of Practice (Bullitt's), provides that, "If a judgment be reversed, and the case remanded for a trial or other proceedings, it shall stand for trial or for such other proceedings in the court whence the appeal was taken, at the next succeeding term thereof; provided that the mandate of the Court of Appeals be filed in the clerk's office of the lower court, and notice thereof given to the adverse party; if he be in the county, or, if he be absent from the county, to his attorney, ten days before the commencement of such term. Such cases shall have the same position on the docket of such court as if no appeal had been taken; and at any trial after the mandate is filed and notice thereof given as aforesaid, either party may take depositions, as in other cases."

The mandate issued by this court was addressed to the Spencer

Circuit Court, and commanded that court to award a new trial, and to take further steps consistent with the opinion delivered upon the reversal of its judgment. The mandate was imperative on the court below. It was bound to enter it upon its records, and it was not competent for the judge, in or out of court, to do any act of contravention of its requirements, or to take any steps to disable the court from acting in obedience thereto. *Holley v. Holley*, 5 Litt. 290; *Watson v. Avery*, 3 Bush 635; *Scott v. Scott's Ex'r*, 9 Bush 174. If the venue had been changed at the time the application was made, the mandate of this court could never have reached the court to which it was addressed, and that court would have been disabled from granting the new trial. The parties were not then in a position to take depositions, much less to take proceedings in the cause, which from their very nature could not precede, but must follow the granting of the new trial. If the order for the change of venue had been made it would have been a nullity, and the circuit judge for that reason, if for no other, properly overruled the application.

It is next contended that instruction No. 2, given at the instance and on the motion of appellees, was misleading and erroneous. Said instruction is as follows: "If the jury believe from the preponderance of the evidence that the paper "AK" was procured to be executed by fraud or undue influence, or that at the time of its execution W. H. Stokes had not a sound and disposing mind and memory, they should find said paper not to be the will of said Stokes."

This is but a converse of a proposition embodied in the first instruction given for the appellants, and it is not seriously insisted that it is incorrect as a mere abstract legal proposition. But appellants do contend that the evidence before the jury did not warrant the court in giving it. To determine this question it is necessary to review in a general way the evidence presented by the record before us.

The deceased was a man of fine business capacity, and accumulated a large fortune. When in the enjoyment of good health he was resolute, determined and self-reliant, and not likely in business motives, to yield to the influence or control of anyone. For some months before the publication of the paper in contest he suffered from failing health, and was more or less despondent on that account. About the 20th of December, 1874, he was stricken with paralysis, which affected one of his arms. Whether the paralysis was partial, and proceeded from some local injury or nervous affection, or whether it affected one side of the body and proceeded from the brain

is left an open question of the evidence. It may be that the evidence preponderates in favor of the last conclusion. But when the statements of the negro man, Robert Parker, as to the opinion expressed by Dr. Rodgers to Stokes after a careful examination, that he was threatened with disease of the brain, and the fact that in a few months thereafter he was stricken with paralysis which may have evidenced disease of that organ, according to the testimony of Dr. Coleman Rogers, Jr., and which did evidence such a disease in the opinion of Dr. Koheler, the only medical man testifying who attended on Stokes during his last and fatal illness, are considered, we cannot say there was not evidence before the jury tending to show that when the alleged will was prepared and published, the mental faculties of the deceased were so far affected by the disease in question as to render him incapable of disposing of his large estate.

It is true the character of Parker was attacked, but his story is inherently probable; and is to some degree confirmed by Mrs. Marshall in one of her letters to Mrs. Shippen, and also by the testimony of Mrs. Harrison. At any rate the jury had the right to believe him, and they seem to have done so.

But independent of this direct evidence of mental incapacity, there are other circumstances, standing prominently out in this case, which the jury had the right to consider on the question of fraud and undue influence, as well as that of mental incapacity. The deceased gave, as a reason for discriminating against Mrs. Shippen, that he had advanced her greatly more than any of his other children. This according to the record before us was a mistake, which he would not have made if he had been in full possession of his faculties.

Mrs. Shippen proves that the advances made to her were insignificant in character and value, and the propounders of the will not only failed to contradict her statements in this regard, but showed that some of them had received much more from the bounty of the deceased, than the daughter against whom the discrimination was made. This discrimination is irreconcilable with the well-known and marked affection which the deceased entertained for Mrs. Shippen when in good health, and was altogether inconsistent with the intentions he expressed when at Mound City a few months before his death, and it cannot be accounted for on the ground that he was displeased with Mrs. Shippen's husband.

It is true that he did not regard Shippen as a good business man, and was unwilling longer to be connected with him as a partner. But there is nothing in the record tending to show that he had any

personal grievance against Shippen or that he did not regard him as an upright, honest and worthy man.

The jury had also the right to consider the provisions of the paper itself in deliberating on the question of mental incapacity, fraud and undue influence. Whilst it is altogether reasonable that a sane man should desire his estate kept together for the period of ten years, and the incomes and profits accruing during that period of time added to the general fund before the final distribution among the objects of his bounty, there are many features in the peculiar provisions of the paper in contest, relating to the management of the estate by the nominated executors, contradictory of the decedent's whole life. One of the strangest traits of his character as a business man was his disposition to invest his means in real estate, and though he was worth probably half a million dollars at the time of his death, the proof shows that he had always been adverse to dealing in stocks or bonds, or personal securities of any kind, and owned practically none of such securities at the time his ill health compelled him to give up the active management of his business affairs.

Yet we find him imparting his large estate to two executors, the eldest of whom, a son-in-law, is not shown to be a business man of more than usual ability, and the youngest, a son, who had just attained his majority, whose health was delicate, and who could have had no considerable experience, and these executors were empowered by the alleged will to sell and convey any and all the estate of the decedent, real, personal and mixed, wherever situated, in this or any other state, at either private or public sale, and on such terms as they might see proper; and they were requested as soon as convenient to sell all the unimproved and unproductive real estate wherever situated, and with the proceeds thereof, or any other money in their hands, to improve, repair or purchase other real estate, or to purchase stocks, bonds or other property at their discretion. In the language of the alleged will the decedent vested the nominated executors with full power and authority for the term of ten years to do anything with his estate and the incomes, rents and proceeds thereof, that he could or would do, if alive, with a few immaterial exceptions and restrictions.

No reason is given and none has been assigned, why at the end of long, laborious and successful life, the decedent should abandon a policy that had led him on to fortune, and why at a time when the financial disturbances of the country had greatly imperiled the value of stocks and bonds and rendered them undesirable, if not dangerous,

investments, he should direct his real estate to be sold, and not only empower but request his executors to invest the proceeds, in part at least, in property in which he had always refused to deal under the most favorable circumstances.

It was also the province of the jury to take into consideration the fact that the executors, in whom these unusual powers were vested and whose discretion in the management of this large estate was so unlimited, had constant access to the deceased during his last illness, and that one of them lived in the house with him. They had also the right to consider that Mrs. Shippen, the contestant, lived in a distant state, and did not see her father during his last illness, and whilst she may not have been kept away from him by the letters written her by one of the favored legatees, she was at least not informed of the fact that his condition was such that it was essential that she should visit him without delay in case she expected or desired to see him alive.

It may be that the direct and circumstantial evidence tending to show mental incapacity on the part of the decedent does not come up to that standard which would induce a court to hold that he had not a sound and disposing memory on the 29th of December, 1874, and that the other circumstances in proof, considered in connection with the remarkable features of the will we have first pointed out, and with the admitted physical feebleness of Stokes at the time just mentioned, are insufficient to satisfy the legal mind that the execution of the paper was procured either by fraud or by undue influence; yet it is impossible to say that there was not evidence before the jury tending in some degree to support each one of the propositions embodied in the instruction under consideration, and we cannot decide that the finding of the jury, no matter on which of these propositions it may have relied, was flagrantly or palpably wrong.

We are bound by the statute to give to their verdict the same effect as is given to verdicts in other than will cases.

In this case we cannot, therefore, reverse the judgment of the circuit court on the ground that the verdict of the jury is not sustained by sufficient evidence, nor can we hold that the law of the case was not fully and fairly presented by the court's instructions.

Exceptions were taken to various rulings of the court below in the admission and rejection of evidence, but said exceptions are not insisted on in this court, and we have failed to perceive that there

was any error in this regard prejudicial to the rights of the appellants.

Judgment *affirmed*.

*Bullock & Anderson, W. J. Caldwell, for appellants.*

*Semirall & Bodley, C. M. Harwood, E. E. McKay, for appellees.*